**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DANNY KING;** | ) | |
| **ALL BROTHERS TRUCK REPAIR LLC;** | ) | |
| **and** | ) | |
| **ALL BROTHERS TRUCK AND** | ) | |
| **EQUIPMENT** | ) | |
| **REPAIR LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **JURY DEMANDED** |
| | ) | |
| **SUNRISE BUSINESS SOLUTIONS, LLC,** | ) | |
| **d/b/a ERC GUARANTEED and d/b/a** | ) | |
| **IRSPLUS;** | ) | |
| **ORLANDO BENAVIDES; and** | ) | |
| **MYRIAM ROSENZWEIG,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**COMPLAINT**

Plaintiffs Danny King ("King"), All Brothers Truck Repair LLC ("ABTR"), and All Brothers Truck and Equipment Repair LLC ("ABTER"), through counsel, bring this action against Defendants Sunrise Business Solutions, LLC, d/b/a ERC Guaranteed and IRSplus ("Sunrise"), Orlando Benavides ("Benavides"), and Myriam Rosenzweig ("Rosenzweig"), and allege as follows:

## I. NATURE OF THE ACTION

1. This case concerns the unauthorized diversion and negotiation of nine United States Treasury Employee Retention Credit ("ERC") refund checks totaling $248,717.76. The checks were

payable to two Tennessee businesses but mailed to an address that Defendant Sunrise Business Solutions, LLC ("Sunrise") identified as its own address in proposed ERC purchase agreements. The Bureau of the Fiscal Service subsequently determined that the disputed endorsements on all nine instruments were forgeries. (Exhibits F, G, K, and M.)

2. Danny King ("King") retained Sunrise, doing business as ERC Guaranteed and IRSplus, for the limited purpose of preparing and administering lawful ERC claims. The original fee arrangement required payment to Sunrise after the client received its refund. The single agreement King acknowledges signing provided for a 20% fee and contemplated that IRS refund checks would be mailed directly to the client. (Exhibits A and B.)

3. That limited engagement did not authorize Sunrise or its personnel to direct Plaintiffs' checks to Sunrise's own address, receive or negotiate checks payable to Plaintiffs, or retain their proceeds. King did not authorize those acts under any oral, written, or electronic agreement. (Exhibit B.)

4. Plaintiffs allege on information and belief that Sunrise used access and information obtained through the ERC engagement to cause or facilitate the redirection of the checks to 7420 S. County Line Road, Suite 16, Burr Ridge, Illinois. The same address appears as Sunrise's "Buyer" address on two purchase agreements dated July 2, 2025 that King did not sign and for which Plaintiffs received no consideration. (Exhibits B, F, G, J, and K.)

5. Sunrise did not tell King that the nine checks had been sent to the address it identified as its own and negotiated. King learned through his own inquiries that the IRS had issued checks, pursued refund traces, and obtained the Treasury records. Even after the checks had been negotiated, Sunrise personnel continued describing the problem as an IRS backlog and

soliciting new agreement authority without disclosing the diversion and negotiation. (Exhibits B, L, M, N, and O.)

## II. THE PARTIES

6. Plaintiff Danny King is an adult citizen of Tennessee residing in Davidson County and is the sole member of each Plaintiff limited liability company.

7. Plaintiff All Brothers Truck Repair LLC ("ABTR") is a Tennessee limited liability company whose sole member is King. ABTR was the payee of five of the disputed Treasury checks.

8. Plaintiff All Brothers Truck and Equipment Repair LLC ("ABTER") is a Tennessee limited liability company whose sole member is King. ABTER was the payee of four of the disputed Treasury checks.

9. ABTR and ABTER seek recovery for injuries to their own business and property. King individually seeks relief only for representations directed to him, purported personal commitments, unauthorized use of his identity, and other personal interests; he does not seek the face value of LLC checks in his individual capacity.

10. Defendant Sunrise Business Solutions, LLC is an Illinois limited liability company conducting business under the names ERC Guaranteed and IRSplus. The latter two names are alleged as Sunrise's trade names, not as independently identified legal entities. Sunrise has identified business addresses at 980 N. Michigan Avenue, Suite 1400, Chicago, Illinois, and 7420 S. County Line Road, Suite 16, Burr Ridge, Illinois.

11. Sunrise solicited and served Tennessee businesses, received King's tax and identifying information in connection with those services, communicated repeatedly with King in Tennessee, and dealt with federal tax refunds payable to Tennessee business entities. Its conduct described here was intentionally directed at Plaintiffs in this District.

12. Defendant Orlando Benavides ("Benavides") was an employee, representative, manager, or agent of Sunrise. He identified himself as a tax-credit advisory manager, communicated proposed ERC purchase and expediting terms to King, solicited agreement authorization and banking details, and was identified as a Buyer contact in the July 2025 documents. (Exhibits E, F, G, and H.)

13. Defendant Myriam Rosenzweig ("Rosenzweig") was an employee, representative, or agent of Sunrise. She identified herself as an ERC compliance and expediting advisor and personally communicated with King in May and August 2026 about asserted IRS delays, proposed legal assistance, and additional contract authority. (Exhibits N and O.)

14. Benavides and Rosenzweig are sued individually on claims grounded in their own alleged conduct, not solely because of their employment. Sunrise is also alleged to be responsible for its own conduct and that of persons acting for it within the scope of their work, pursuant to authorization or ratification, or for Sunrise's benefit. The scope of Plaintiffs' ERC engagement and the scope of an employee's work for Sunrise are separate questions.

## III. JURISDICTION, PERSONAL JURISDICTION, AND VENUE

15. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and 18 U.S.C. § 1964 because Count II alleges violations of 18 U.S.C. § 1962(c) and a federal question is therefore presented.

16. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining claims because they arise from the same transactions, communications, address changes, and Treasury checks as the federal claim. Declaratory relief is sought pursuant to 28 U.S.C. §§ 2201 and 2202 in connection with an actual controversy within this Court's jurisdiction.

17. This Court may exercise personal jurisdiction over Sunrise because it purposefully created and administered ongoing commercial relationships with Tennessee businesses and directed the alleged representations and misconduct toward King and those entities in Tennessee. The claims arise from those Tennessee-directed activities.

18. This Court may exercise specific personal jurisdiction over Benavides and Rosenzweig because each purposefully directed the particular interstate emails and course of conduct alleged against that defendant to King in Tennessee, and the alleged injuries relate to those communications and the associated transactions. Plaintiffs also invoke the applicable provisions of 18 U.S.C. § 1965 to the extent supported by the facts and service.

19. Venue is proper in the Nashville Division under 28 U.S.C. § 1391(b)(2) because material portions of the alleged solicitation, agreement formation disputes, interstate communications, authorized business administration, and injury to the Tennessee Plaintiffs occurred in this District. Venue is also alleged under 18 U.S.C. § 1965 to the extent applicable.

## IV. THE ORIGINAL ERC ARRANGEMENT AND LIMITED AUTHORITY

20. On January 17, 2024, King executed through DocuSign an ERC Client Agreement on behalf of ABTER. The agreement identifies ABTER as the client and bears an identifiable DocuSign envelope number and King's electronic signature. This is the one Sunrise agreement King acknowledges executing. (Exhibits A and B.)

21. Sunrise also sought an ERC Client Agreement for ABTR. King declined and did not execute that agreement for ABTR. There is no corresponding ABTR agreement that King acknowledges signing. (Exhibit B.)

22. The January ABTER agreement provided a fee equal to 20% of the ERC actually received by the client, generally payable within ten days of the client's receipt of its refund checks. It

stated that checks and notices would be mailed directly to the client at its existing Form 941 address or a new address the client provided. (Exhibit A, pp. 2-3.)

23. Section L of the January agreement permitted Sunrise, "for CLIENT's convenience," to sign certain IRS forms, including Forms 941-X, 943-X, 8821, 8822-B, and 2848, with that authority expressly limited to the ERC application, tax-information authorization, notifications, and status inquiry for 2020 and 2021. Section L does not expressly identify Form 3911. (Exhibit A, p. 4.)

24. Neither King nor either Plaintiff company authorized Sunrise or any person acting on its behalf to substitute Sunrise's mailing address for Plaintiffs' authorized IRS mailing addresses, intercept Plaintiffs' Treasury refund checks, or endorse, deposit, or negotiate those checks, whether purportedly on Plaintiffs' behalf or for Sunrise's own benefit. Nevertheless, the nine Treasury checks were directed to Sunrise's identified Buyer address and negotiated through endorsements subsequently adjudicated by the Bureau of the Fiscal Service to be forgeries. Plaintiffs allege, upon information and belief, that the unauthorized diversion and negotiation of the checks were intentional, fraudulent acts undertaken outside the scope of any authority conferred by Plaintiffs. (Exhibits A, B, F, G, K, and M.).

25. The January agreement also contains a standardized provision requiring arbitration in Cook County, Illinois under AAA Commercial Arbitration Rules, providing for confidentiality, and restricting the arbitrator from awarding punitive, treble, consequential, or special damages. Related limitations cap certain purported claims against Sunrise. (Exhibit A, pp. 4-5.)

26. The contract was Sunrise's standard form, presented electronically without separate negotiation of arbitration, delegation, forum, the restriction on statutory remedies, or its

limitations on liability. King is a Tennessee small-business owner and was not separately asked to execute a stand-alone delegation agreement. (Exhibits A and B.)

## V. DISPUTED LATER AGREEMENTS AND THE ESCALATION OF FEES

27. On December 20, 2024, Benavides offered King a supposed reduction of an expediting fee to 80% of accrued IRS interest and claimed that signing would guarantee an ERC recovery before the program ended. A subsequent standardized email in May 2025 described a buyout or advance that allegedly would avoid income taxes and provide funds within forty-eight hours. (Exhibit E.)

28. A purported May 8, 2025 ERC Expediting Agreement identifies ABTR and purports to charge an additional 60% of the client's total late interest received from the IRS. It also purports to contain King's electronic signatures, an individual guaranty, and a proprietary IRSplus electronic-signature certificate. King denies entering into or authorizing that agreement. (Exhibits B and D.)

29. The May document incorporates broad arbitration, remedy-limitation, purported consent, and waiver language. Its electronic certificate claims signature events and references earlier account creation and upload of a client photo ID. The existence of that certificate, without more, does not resolve the disputed question whether King himself authorized or performed the claimed electronic acts. (Exhibits B and D.)

30. By January 10, 2025, IRSplus had already told King in an email that his "Photo ID has been confirmed." Sunrise therefore possessed identifying material before the later July documents. The same underlying image of his identification appeared in subsequent unsigned purchase papers, which does not independently establish assent. (Exhibits C, D, F, and G.)

31. On June 25, 2025, Benavides emailed King that a purported lender wished to purchase certain filed ERC quarters, stated that the purchaser would pay 75% of filed ERC value, and suggested that approximately $75,000 might be received the following day or within forty-eight hours. He also made representations about avoiding amendments to tax returns and taxes on the proposed transaction. (Exhibit E.)

32. The two proposed ERC Claim Purchase Agreements are dated July 2, 2025, identify Sunrise itself as Buyer, and state Sunrise's Buyer address as 7420 S. County Line Road, Suite 16, Burr Ridge, Illinois. They identify the two Plaintiff LLCs separately as sellers. (Exhibits F and G.)

33. The ABTR proposal lists $143,189.03 in filed claims and a 75% proposed purchase price of $107,391.77. The ABTER proposal lists $51,713.30 in filed claims and a 75% proposed purchase price of $38,784.98. The total contemplated purchase consideration was $146,176.75. These proposed purchase figures are distinct from the $248,717.76 face value of the nine subsequently issued Treasury checks, which included interest. (Exhibits F and G.)

34. The purported July documents contain blank Seller, Buyer, and Guarantor signature lines and blank wire-transfer instructions. Their provisions contemplate the payment of the purchase price after execution and define the effective date by remittance of that payment. The notices of exercise of purchase likewise do not contain completed Buyer execution. (Exhibits F and G.)

35. In their unsigned terms, those proposals would authorize the Buyer to take possession of and negotiate checks payable to Plaintiffs, deposit them to accounts selected by the Buyer, and cause ERC payments and IRS correspondence to be mailed to Sunrise through Form 8822-B.

The proposed terms purported to transfer the economic rights to the designated claims after execution and payment. (Exhibits F and G.)

36. On July 3, 2025, the day after the date typed on the proposed agreements, Benavides emailed King with the proposals attached and stated that the only remaining step was sending a DocuSign request for King to sign and obtaining his banking details to receive a wire payment. (Exhibits E and H.)

37. King never executed either July proposal, never authorized another person to sign it for him, and never agreed to provide the endorsement, deposit, or address-redirection powers recited in those documents. Neither King nor either LLC received any purchase payment, advance, proceeds, or other consideration for either July proposal or the alleged May expediting transaction. (Exhibit B.)

## VI. RETURNED CHECKS, IRS ADDRESS CHANGES, AND THE BURR RIDGE DESTINATION

38. The original business location at 3716 Dickerson Pike, Nashville, Tennessee was no longer in use. IRS notices dated June 30, 2025 reported that two ABTR refund checks mailed to that former location had been returned as undeliverable and instructed the taxpayer to update its mailing information. (Exhibit I.)

39. King subsequently obtained and legitimately used P.O. Box 291031, Nashville, Tennessee 37229, as a mailing address for the businesses. That was King's authorized Tennessee P.O. Box, not Sunrise's Illinois address. (Exhibits B, J, and L.)

40. IRS address-change notices dated July 28, 2025 identify an earlier mailing location at 7420 S. County Line Road, Suite 16, Burr Ridge, Illinois, and a subsequent address update to the Nashville P.O. Box. The earlier notice contains an inconsistent state or ZIP-code rendering, and Plaintiffs do not adopt that rendering as a correct geographical description. (Exhibit J.)

41. The address appearing on the checks matches the address Sunrise identified as its own Buyer address in the unsigned July 2 purchase documents. Neither King nor either Plaintiff LLC resided, operated, or received mail at that location, and King never authorized its use as the destination for the refund checks. (Exhibits B, F, G, and K.)

42. Sunrise, through persons working for it or in concert with it, caused or participated in causing the unlawful interception and diversion of Plaintiffs' ERC checks by alteration of Plaintiffs' IRS mailing information so that the checks were issued to Sunrise's identified Buyer address. (Exhibits B, F, G, J, and K.)

## VII. NINE CHECKS, UNAUTHORIZED NEGOTIATION, AND TREASURY DETERMINATIONS

43. The Treasury issued the following five refund checks payable to ABTR, all addressed to the Burr Ridge location. (Exhibit K.)

44. Check No. 73442372, second quarter 2020, $49,156.81, issued July 8, 2025.

45. Check No. 73442373, third quarter 2020, $7,592.97, issued July 8, 2025.

46. Check No. 73442374, fourth quarter 2020, $11,639.54, issued July 8, 2025.

47. Check No. 73711991, first quarter 2021, $73,859.59, issued July 15, 2025.

48. Check No. 73442375, second quarter 2021, $41,579.86, issued July 8, 2025.

49. The five ABTR checks total $183,828.77.

50. The Treasury issued the following four refund checks payable to ABTER, also addressed to the Burr Ridge location. (Exhibit K.)

51. Check No. 73442383, third quarter 2020, $2,575.23, issued July 8, 2025.

52. Check No. 73711997, fourth quarter 2020, $12,272.85, issued July 15, 2025.

53. Check No. 73442384, first quarter 2021, $26,187.76, issued July 8, 2025.

54. Check No. 73711998, second quarter 2021, $23,853.15, issued July 15, 2025.

55. The four ABTER checks total $64,888.99. The aggregate face value of all nine disputed checks is $248,717.76.

56. Neither King nor either company received the nine checks or any portion of their proceeds. King did not endorse, deposit, or authorize negotiation of any of them and did not permit Sunrise or any other person to do so. (Exhibit B.)

57. King submitted missing-refund inquiries, including Forms 3911, and subsequently made Treasury FS-1133 claims denying receipt, signing, deposit, permission, or benefit. (Exhibits B and L.)

58. Treasury records reflect that the nine checks were negotiated through the banking system. The check images identify processing information but discovery is needed to establish each actual deposit account and the identity of the person who presented each check. (Exhibits K and L.)

59. The United States Treasury Bureau of the Fiscal Service issued nine determination letters between May 27 and June 2, 2026. Each states that forgery was determined in the adjudication of the identified check claim and that funds were being transferred back to the authorizing Treasury department. (Exhibit M.)

60. The Treasury determinations do not identify who physically endorsed the checks, who initiated the deposits, or who ultimately retained the proceeds. Plaintiffs allege on information and belief that Sunrise or persons acting in concert with it exercised wrongful dominion over the checks or their proceeds based upon the documentary circumstances alleged above. (Exhibits F, G, J, K, and M.)

## VIII. KING'S INDEPENDENT DISCOVERY AND SUNRISE'S CONTINUING SOLICITATIONS

61. King did not learn the true disposition of the checks from Sunrise. In a contemporaneous September 9, 2025 handwritten chronology, King recorded that he had been told by the IRS on approximately August 29, 2025 that checks had been issued, despite his having received none. He pursued the missing payments through his own IRS and Treasury inquiries. (Exhibit L.)

62. Being informed that checks had been issued did not mean King had received check copies, knew that they had been negotiated without authorization, knew the destination or deposit accounts, or knew who obtained their proceeds. King learned of the unauthorized negotiation and Treasury's forgery findings through subsequent records and government determinations, rather than through voluntary disclosure by Sunrise. (Exhibits B, K, L, and M.)

63. On May 18, 2026, Rosenzweig emailed King under the subject "All Brothers Truck Repair LLC: Updated Agreement Authorization to Help Ensure ERC Funds Are Received." She cited a "significant nationwide backlog" at the IRS and stated that there was "no estimated timeframe for when checks may be issued or received," while urging King to sign an updated agreement. (Exhibit N.)

64. On August 31, 2026, Rosenzweig sent another email headed "All Brothers Truck Repair LLC: Your 90-day ERC refund protection is now active," referred to King's supposed current agreement and continued IRS delays, and promoted a purported attorney/lobbyist arrangement. Copies of the related proprietary electronic agreement interface available to King displayed an additional expediting fee of "100.00 % (Hundred Percent)" of the client's IRS late interest, along with a purported 90-day guarantee. (Exhibit O.)

65. Plaintiffs allege on information and belief that the continuing sales and claimed-delay communications helped maintain the appearance of an unresolved IRS-processing problem, obscured the material facts of the earlier diversion and negotiation, and sought still broader contractual or economic rights over funds that Plaintiffs had not received. Plaintiff avers that Benavides, Rosenzweig, and other Sunrise personnel knew that Sunrise possessed Plaintiffs' checks, and falsely represented that the delay was due to the IRS in order to increase financial pressure on Plaintiffs and extort a fraudulent additional fee.

66. A further IRS CP148B notice dated June 8, 2026 concerning ABTER displayed King's legitimate Nashville P.O. Box with the Illinois ZIP+4 60527-7947 associated with the earlier Burr Ridge destination. (Exhibit P.)

67. As of this pleading, neither Plaintiff LLC has received replacement proceeds for the nine disputed checks. King has not authorized Sunrise or its agents to redirect any replacement checks. Plaintiffs allege on information and belief that the address irregularity and ongoing use of Sunrise's customer systems create a continuing risk of misdirection or attempted exploitation of Plaintiffs' tax records, warranting investigation and preventive relief; a second completed check interception is not pleaded as an established fact. (Exhibits B, O, and P.)

68. Due to the lack of receipt of any of the IRS checks subsequent to the determination of forgery, Plaintiffs aver that the Defendants have unlawfully changed Plaintiffs' addresses again, intercepted the replacement checks, and deposited them into accounts belonging to Sunrise pursuant to the same illegal scheme as before.

## IX. CONTRACT FORMATION, ARBITRATION, AND THE PRESENT CONTROVERSY

69. ABTR did not execute the January 2024 arbitration agreement. King expressly refused to sign an ABTR agreement. The fact that King owns both LLCs does not itself create ABTR's assent to ABTER's arbitration clause. (Exhibit B.)

70. The disputed May Expediting Agreement and July Purchase Agreements cannot supply enforceable arbitration, delegation, collection, endorsement, assignment, or forum provisions unless Sunrise proves an agreement was actually formed. King denies electronic assent; the July papers have blank signature lines; a preexisting stored ID does not establish assent; and the July 3 email contemplates obtaining signatures in the future. (Exhibits B, C, D, F, G, and H.)

71. The January ABTER arbitration clause covers a "controversy or claim arising from this engagement." Plaintiffs contend that the independently unlawful diversion and forged negotiation of their Treasury instruments, and concealment of those illegal acts, are not services provided under the legitimate ERC engagement and do not become authorized contractual performance merely because Sunrise obtained access and opportunity through it. (Exhibits A, K, and M.)

72. Plaintiffs recognize that the January clause incorporates AAA Commercial Arbitration Rules. They specifically dispute any delegation to arbitrate claims of persons or entities that did not agree to arbitrate, any threshold determination of the formation of the disputed later agreements, and the validity of any purported delegation as applied to the facts pleaded here. The incorporation of AAA rules is not alleged, by itself, to be insufficient notice of delegation.

73. Plaintiffs also specifically challenge the arbitration and claimed delegation arrangements under generally applicable principles of procedural and substantive unconscionability. Sunrise imposed non-negotiated Cook County commercial arbitration and a prohibition on treble and punitive remedies, notwithstanding the statutory relief implicated by the intentional tort and RICO claims alleged. (Exhibit A.)

74. To the extent the July documents purport to select the Northern District of Illinois or Illinois state courts, King denies having assented to them. To the extent any enforceable forum or choice-of-law term is invoked against the Tennessee Consumer Protection Act claim, Plaintiffs invoke Tenn. Code Ann. § 47-18-113(b) and applicable federal law governing transfer and arbitration. (Exhibits F and G.)

## X. THE SUNRISE ENTERPRISE, INTERSTATE PREDICATES, AND CONTINUING SCHEME

75. At relevant times Sunrise, doing business as ERC Guaranteed and IRSplus, was an enterprise within 18 U.S.C. § 1961(4) engaged in interstate commerce. It maintained personnel, client-management systems, stored identification images, contract templates, marketing and payment infrastructure, and tax-administration capabilities. Sunrise carried on ostensible ERC-processing services apart from the alleged pattern. (Exhibits A, C, D, E, F, G, N, and O.)

76. For Count II, Sunrise is pleaded as the RICO enterprise and not as the defendant RICO "person" under § 1962(c). Benavides and Rosenzweig are natural persons legally distinct from the enterprise who were employed by or associated with it.

77. Benavides exercised management responsibility over the buyout and expediting solicitation process, including setting out proposed transactional terms, seeking King's assent and banking information, and serving as Sunrise's designated Buyer contact. Plaintiffs allege his

conduct participated in operating that material aspect of the enterprise. (Exhibits E, F, G, and H.)

78. Rosenzweig exercised responsibility over Sunrise's compliance and expediting communications, represented the purported status of clients' ERC payments, and solicited further agreements through Sunrise's proprietary system. Plaintiffs allege she operated the enterprise's continued client-retention and authorization process. (Exhibits N and O.)

79. The common method alleged involved obtaining sensitive payroll and taxpayer information and limited IRS authority through legitimate-appearing ERC services; offering increasingly expensive expediting or purchase terms knowing customers were under financial pressure; preparing forms that purported to confer broader powers; causing federal ERC instruments to be mailed to the provider's identified address without assent; obtaining unauthorized negotiation of those instruments by forgery; and continuing to market further authority while characterizing nonreceipt as IRS delay.

80. The first specifically identified interstate wire solicitation material to this alleged scheme is Benavides's December 20, 2024 message proposing an expediting charge of 80% of accrued IRS interest and promising an expedited result if King signed. A further standardized message of May 13, 2025 offered a rapid buyout purportedly offering "ZERO taxes" and no amended returns. The communications demonstrate repeated use of Sunrise's sales process, although their fraudulent character is alleged in the context of the overall scheme rather than from the mere quotation of a fee. (Exhibit E.)

81. On June 25, 2025, Benavides transmitted an interstate email offering to buy selected ERC claims at 75% of stated value, promising rapid payment and making representations about tax treatment. The proposed purchaser was later identified in Sunrise's own documents as

Sunrise itself. The alleged material deception concerned the supposed bona fide purchase and source of delay while Sunrise sought control of refunds without a completed and paid transaction. (Exhibits E, F, and G.)

82. On July 3, 2025, Benavides transmitted another interstate email with the unsigned purchase proposals, stating that a DocuSign agreement and bank information remained to be obtained. This email is evidence of the continuing effort to obtain apparent purchase authority and of the absence of assent to the July 2 documents. (Exhibit H.)

83. Before issuance of the replacement checks, one or more Sunrise employees or cooperating persons transmitted an unauthorized address instruction to the IRS by mail, wire, or other interstate means, causing the refund instruments to be addressed to Sunrise's identified Burr Ridge Buyer location. The precise sender, transmission mode, and time are within the custody of the IRS and persons participating in the process and discovery is needed to identify these facts. (Exhibits F, G, J, and K.)

84. On July 8, 2025, six replacement Treasury checks and on July 15, 2025, three additional checks were mailed to the Burr Ridge destination. Plaintiffs allege the mailings were foreseeable and instrumental to the Defendants' racketeering scheme because delivery to that address was the means of obtaining possession and facilitating unauthorized negotiation, including by forgery. The collective value was $248,717.76. (Exhibit K.)

85. On May 18, 2026, Rosenzweig transmitted an interstate email attributing nonreceipt to IRS backlog and uncertainty and seeking a new agreement after the checks had already been issued and negotiated. Plaintiffs allege this communication was a lulling act in furtherance of the same alleged scheme because it concealed the particular transactions and sought further authority. (Exhibits K, M, and N.)

86. On August 31, 2026, Rosenzweig transmitted another interstate email relying upon a supposed existing agreement, characterizing the payments as still delayed by the IRS, and promoting further expediting terms. The related electronic interface displayed a 100% late-interest fee. Plaintiffs allege this was a subsequent solicitation and act of concealment in continuation of the same scheme. (Exhibit O.)

87. The events were related in participants, client account, claimed authority, interstate communication methods, document systems, target property, and objective. The solicitation and purported authorization practices extended at least from December 2024 through August 2026, while the disputed checks were redirected and negotiated during July 2025.

88. The marketing contained standardized wording directed to Sunrise clients generally, and the same customer-profile and electronic-agreement systems continued to be used after the original checks had been negotiated and Treasury had found forgery. On information and belief, the relevant business processes remained available to solicit ERC clients and seek new authority. Plaintiffs allege a threat of continuing fraudulent solicitation and misappropriation. (Exhibits E, N, O, and P.)

## XI. DAMAGES AND PROSPECTIVE RISK

89. ABTR was deprived of the possession and use of at least five checks totaling $183,828.77, and ABTER was deprived of at least four totaling $64,888.99. Plaintiffs have received no check proceeds or purchase consideration and suffered the loss of use of those funds, expenses incurred in tracing the missing payments, and other provable injury to business or property. (Exhibits B, K, L, and M.)

90. Due to the lack of receipt of any substitute IRS checks following their determination of forgery, it is reasonable to infer and Plaintiffs therefore aver that the Defendants have repeated their illegal acts and intercepted the replacement checks due and owing to Plaintiffs.

## COUNT I

## DECLARATORY JUDGMENT - CONTRACT FORMATION, ARBITRATION, AND PURPORTED ASSIGNMENTS

### Against Sunrise Business Solutions, LLC

91. Plaintiffs incorporate by reference paragraphs 1 through 90 of this Complaint as though fully set forth herein.

92. An actual controversy exists between Plaintiffs and Sunrise regarding the existence and enforceability of the purported May 2025 Expediting Agreement, both July 2, 2025 Purchase Agreements, their individual guarantees and purported transfers, and any provision purporting to require arbitration, delegation, or an Illinois forum. Sunrise continues to refer to a purported current agreement and has retained documents purporting to confer the disputed rights. (Exhibits B, D, F, G, and O.)

93. ABTR did not execute an arbitration agreement with Sunrise. King did not assent to the later purported agreements for either LLC or on his own behalf. The stored identity photograph, typed personal details, and disputed proprietary electronic records do not establish actual assent absent sufficient proof of an authorized signing event. (Exhibits B, C, D, F, G, and H.)

94. The executed January ABTER agreement is limited to its legitimate ERC engagement; Plaintiffs dispute that its arbitration clause reaches the independent illegal acts alleged herein. Plaintiffs specifically challenge any claimed delegation and the unconscionable combination of a distant compulsory commercial forum and restrictions on treble and punitive relief, and

assert that the contract and arbitration clause therein is unenforceable as a contract of adhesion. (Exhibit A.)

95. Pursuant to 28 U.S.C. §§ 2201-2202, Plaintiffs seek a declaration of the parties' rights as to formation and the purported transfers and authority, the existence and applicability of arbitration or delegation arrangements, and the enforceability and scope of purported forum-selection and remedy-limitation terms.

**COUNT II**

**CIVIL RICO - 18 U.S.C. § 1962(c)**
**Against Orlando Benavides and Myriam Rosenzweig**

96. Plaintiffs incorporate by reference paragraphs 1 through 90 of this Complaint as though fully set forth herein.

97. Sunrise is the legal-entity enterprise engaged in interstate commerce; Benavides and Rosenzweig are separate individual persons employed by or associated with it. The enterprise possessed the organizational structure and continuing commercial infrastructure alleged above.

98. Benavides participated in operating the enterprise's buyout and expediting process by devising or communicating offers, seeking purchase-related signatures and bank details, and acting as the point of contact for Sunrise as proposed Buyer. The messages of December 20, 2024, May 13, June 25, and July 3, 2025 are identified by sender, approximate date, recipient, content, and purpose. (Exhibits E and H.)

99. Rosenzweig participated in operating the enterprise's compliance and client-reauthorization activities through the May 18 and August 31, 2026 interstate communications and related electronic agreement process. Plaintiffs allege those acts knowingly advanced the concealment and continued monetization of Plaintiffs' ERC rights; the extent of her

knowledge about the original check negotiation remains subject to discovery. (Exhibits N and O.)

100. The alleged predicate acts consist of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343, as pleaded with the particular communications, federally mailed checks, requested signatures, address evidence, and concealment alleged in Section X. Plaintiffs allege that the fraudulent course of conduct included knowing use of interstate mails or wires to obtain and retain financial control through unauthorized tax-account access and to conceal those transactions.

101. The predicate communications and mailings were related in participants, methods, purpose, and targeted property and were part of the continuing course of business alleged above. Plaintiffs assert an open-ended threat of repetition based on the standard customer solicitation practices and continuing reauthorization process, and plead the duration and relatedness of actual acts as additional evidence of continuity.

102. ABTR and ABTER suffered direct injury to specifically identified business property when the checks were sent to Sunrise's identified address and negotiated without authorization. Plaintiffs seek from each individual defendant only damages proven to have been proximately caused by that defendant's participation in the § 1962(c) pattern, including resulting loss of use and additional pecuniary injury, not automatic personal liability for acts of unknown participants.

103. Under 18 U.S.C. § 1964(c), ABTR and ABTER demand threefold their recoverable actual business-and-property damages caused by the alleged RICO violation, together with reasonable attorneys' fees and costs, subject to prevention of double recovery.

**COUNT III**

**FRAUD, INTENTIONAL MISREPRESENTATION, AND FRAUDULENT CONCEALMENT**

**Against Sunrise, Benavides, and Rosenzweig**

104. Plaintiffs incorporate by reference paragraphs 1 through 90 of this Complaint as though fully set forth herein.

105. Sunrise represented in its original engagement that it would use the tax and identity information provided for legitimate ERC administration and that the refunds would be delivered directly to the clients before its percentage fees became payable. King provided information and authorized limited assistance in reliance on the described service arrangement. (Exhibits A and B.)

106. On information and belief, persons acting for Sunrise used the access so obtained to cause or facilitate redirection and unauthorized negotiation of Plaintiffs' Treasury checks, contrary to the stated purpose and limitations of the engagement, without disclosing that change in course. The factual bases for the inference include the identical Buyer/destination address, the absence of executed purchase terms, and subsequent forgery findings. (Exhibits F, G, J, K, and M.)

107. Benavides made particular representations in December 2024 and May-June 2025 concerning the availability and value of expediting or buyout services, the prospect of rapid payment, purported tax consequences, and the process of obtaining contract signatures. Plaintiffs allege that, insofar as those representations were used to obtain broader rights over refunds without a bona fide completed purchase, they materially misstated the character and purpose of the proposed transactions. (Exhibits E and H.)

108. Rosenzweig made representations on May 18 and August 31, 2026 describing IRS delay and asserting a need for further contract authority and expediting assistance, while omitting

that the particular nine checks at issue had already been issued and negotiated. The May statement that issuance remained uncertain was at least materially misleading as applied to the nine identified payments. (Exhibits K, N, and O.)

109. Sunrise had a duty arising from its claimed agency and entrusted responsibility over sensitive tax matters to disclose known material information about its receipt or control of Plaintiffs' checks and the disposition of payments, and it undertook affirmative status communications that were materially incomplete. Plaintiffs allege intentional concealment by persons with knowledge of the transactions, with the precise individual actors to be identified through discovery.

110. Plaintiffs allege reliance on the initial limited-service representations in entrusting their information and administrative access, and that subsequent misstatements and concealment materially impeded discovery of the destination, negotiation, and recovery of the checks. Plaintiffs seek only actual damages proven to have resulted from actionable reliance or concealment and not damages attributable to a representation on which they did not rely.

111. The Defendants' fraud was intentional or reckless, material, made or concealed to induce Plaintiffs to surrender control or refrain from discovering unauthorized use of their tax accounts, and caused the property deprivation and incremental pecuniary losses to the extent shown by proof. Sunrise is liable for the conduct of authorized or ratified representatives within the scope of their work; individual defendants are liable, if at all, only for their own actionable conduct.

## COUNT IV

## CONVERSION

**Against Sunrise Business Solutions, LLC**

112. Plaintiffs incorporate by reference paragraphs 1 through 90 of this Complaint as though fully set forth herein.

113. ABTR and ABTER had ownership and immediate possessory rights in the specifically identified Treasury checks payable to them, absent an effective purchase or other lawful transfer. Neither July purchase agreement was signed, and no purchase consideration was received. (Exhibits B, F, G, and K.)

114. Sunrise through its personnel or persons acting in concert with it intentionally took, controlled, caused the negotiation of, or obtained the economic benefit of the checks and their traceable proceeds in a manner inconsistent with Plaintiffs' ownership and without their consent.

115. The checks were addressed to the precise location Sunrise identified as its Buyer address, were negotiated without Plaintiffs' permission, and were adjudicated by the IRS as bearing forged endorsements. The identity of the depositary account holder and individual endorsers remains the subject of discovery. (Exhibits B, F, G, K, and M.)

116. ABTR and ABTER suffered the value and lost use of their identifiable property and consequent losses. They seek compensatory relief and other remedies authorized by applicable law.

## COUNT V

## BREACH OF DUTIES ARISING FROM AGENCY AND FIDUCIARY DUTY, IN THE ALTERNATIVE

**Against Sunrise Business Solutions, LLC**

117. Plaintiffs incorporate by reference paragraphs 1 through 90 of this Complaint as though fully set forth herein.

118. Sunrise undertook a defined agency role in representing Plaintiffs concerning federal employment-tax claims, received highly sensitive tax information, and sought authority to sign specified IRS documents and receive notices for the client's convenience. ABTR also provided information for ERC administration through its actual dealings with Sunrise, notwithstanding the absence of an executed client agreement for ABTR. (Exhibits A, B, and E.)

119. To the extent Sunrise acted or purported to act as agent for either company, it owed duties to act within authority, disclose material transactions and conflicts affecting the principal's property, account for property handled, and refrain from using the agency for undisclosed self-dealing. Plaintiffs alternatively allege fiduciary duties arising from the scope of that specific delegated authority and trust, not merely from an ordinary commercial relationship.

120. Sunrise breached those duties, upon information and belief, by causing or facilitating the unauthorized use of its own address for the checks, exercising or enabling dominion over Plaintiffs' payments, withholding material information about their disposition, and using claimed agency authority adversely to Plaintiffs in connection with the later attempted purchase and expediting arrangements. (Exhibits F, G, J, K, M, N, and O.)

121. Those breaches directly caused loss of possession, use, and control of Plaintiffs' checks and further ascertainable losses to the extent proved. Plaintiffs seek damages, an accounting, and appropriate equitable relief.

## COUNT VI

## BREACH OF CONTRACT, PLEADED EXPRESSLY IN THE ALTERNATIVE
**Against Sunrise Business Solutions, LLC**

122. Plaintiffs incorporate by reference paragraphs 1 through 90 of this Complaint as though fully set forth herein.

123. ABTER and Sunrise entered into the January 17, 2024 ERC Client Agreement. ABTER performed its obligations by supplying information and permitting legitimate ERC administration, subject to the actual performance established by the evidence. The agreement contemplated direct receipt of checks by Plaintiffs, followed by compensation to Sunrise. (Exhibit A.)

124. If the January agreement governs any challenged conduct, Sunrise breached obligations concerning limited authorization, service for the client's benefit, and the contemplated manner of receipt and administration of the refunds, to the extent it caused or facilitated redirection, failed to account for checks under its control, or used authority to acquire the client's payments for itself. (Exhibits A, F, G, J, and K.)

125. Plaintiffs continue to deny formation of the disputed May and July agreements. Solely in the alternative under Federal Rule of Civil Procedure 8(d), if any such later agreement is found to have been formed, Sunrise breached its payment and other obligations by claiming the associated rights without paying the specified purchase consideration or delivering bargained-for consideration or services. Neither Plaintiff received any purchase payment. (Exhibits B, D, F, and G.)

126. Plaintiffs seek compensatory damages caused by any enforceable contractual duties found applicable. Alternative contract allegations do not constitute adoption, ratification, or concession of formation or enforceability of the disputed later agreements.

## COUNT VII

## UNJUST ENRICHMENT AND RESTITUTION, PLEADED IN THE ALTERNATIVE
**Against Sunrise Business Solutions, LLC**

127. Plaintiffs incorporate by reference paragraphs 1 through 124 of this Complaint as though fully set forth herein.

128. On information and belief, Sunrise or persons acting for it received or retained the benefit of Plaintiffs' Treasury instruments or their proceeds without an effective purchase, consideration, or authorization. Plaintiffs conferred access and tax-processing opportunities for lawful services, not a gratuitous transfer of checks or ERC proceeds. (Exhibits A, B, F, G, and K.)

129. To the extent the wrongfully retained benefit is not governed by an enforceable agreement, it would be inequitable for Sunrise to keep that benefit without restitution. Plaintiffs seek disgorgement or restitution of proved benefits as permitted by applicable law, without duplicative recovery.

130. An accounting, tracing, and constructive trust over identifiable proceeds or substituted assets are requested as equitable remedies, to the extent Sunrise is shown to have received or controlled them and to the extent such relief is otherwise available.

## COUNT VIII

## TENNESSEE CONSUMER PROTECTION ACT
**Against Sunrise, Benavides, and Rosenzweig**

131. Plaintiffs incorporate by reference paragraphs 1 through 128 of this Complaint as though fully set forth herein.

132. Sunrise marketed and supplied ERC preparation, expediting, and purchase-related services to Tennessee Plaintiffs in trade or commerce. The individually named defendants personally participated in the particular solicitations and representations identified above. (Exhibits A, E, N, and O.)

133. The Defendants engaged in deceptive representations of the characteristics, benefits, and necessity of services, and the existence of purported contractual rights, within the provisions of Tenn. Code Ann. § 47-18-104(b)(5), (12), and (13), to the extent applicable.

134. In particular, Sunrise represented that the original ERC service involved limited administrative authority and fees payable after client receipt; Benavides promoted expediting and purported purchase services promising rapid access to refunds; and Rosenzweig in May and August 2026 portrayed further expediting as necessary or beneficial despite the earlier issuance and negotiation of the particular checks. The August message invoked an alleged existing agreement King denied entering. (Exhibits A, B, E, K, N, and O.)

135. Those descriptions were materially deceptive insofar as the purported services, new rights, and need for further expediting were used to obtain or maintain control over refunds already issued and negotiated without Plaintiffs' authorization. (Exhibits B, F, G, K, M, N, and O.)

136. Plaintiffs relied upon the limited ERC service representations in providing their tax records and authorization and suffered an ascertainable loss of the use and value of their

specifically identified refund checks when that access was misused, together with directly related economic losses. They allege causation and seek recovery only insofar as a privately enforceable statutory practice is proved to have caused the loss.

137. Plaintiffs allege the actionable conduct was knowing or willful, and seek actual damages and where authorized treble damages, reasonable attorneys' fees, costs, and prospective statutory equitable relief under Tenn. Code Ann. § 47-18-109.

138. Under Tenn. Code Ann. § 47-18-113(b), Plaintiffs dispute enforcement of an out-of-state forum or choice-of-law term with respect to this TCPA claim to the extent that the state-law prohibition is applicable and not preempted by controlling federal law.

## XII. REQUEST FOR PROSPECTIVE AND EQUITABLE RELIEF

139. Plaintiffs seek declaratory and, upon the required showing, preliminary and permanent injunctive relief against Sunrise and persons acting in active concert with it pursuant to Fed. R. Civ. P. 65.

140. Absent Plaintiffs' present written authorization, Sunrise and its covered agents should be enjoined from submitting new tax authorizations or address changes in Plaintiffs' names, receiving or negotiating future checks payable to Plaintiffs, using King's stored identity to generate purported signatures, or asserting enforceability of the unsigned July purchase instruments pending resolution of this action.

141. Plaintiffs also request preservation of documents and electronically stored information relating to their ERC matters, including identity assets, all document-generation and signature records, IRS submissions, mailing-address histories, Treasury-check images, bank and payment records, and employee communications, together with such further specific relief as the Court may deem lawful and necessary.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered as follows:

A. Declare the actual rights of the parties concerning the alleged May and July agreements, purported guarantees, purchases, address and endorsement authority, and find any arbitration, delegation, forum, and remedy limitation terms are unenforceable as to the Defendants' illegal acts alleged herein;

B. Award ABTR and ABTER actual compensatory damages proved for the unauthorized diversion and negotiation of their nine identified Treasury checks, associated loss of use, and legally recoverable consequential business losses;

C. Award statutory treble damages, reasonable attorneys' fees, and costs under 18 U.S.C. § 1964(c) against all defendants liable under § 1962(c);

D. Award appropriate actual damages, consequential damages, treble damages, fees, and costs under the Tennessee Consumer Protection Act;

E. Award punitive damages on intentional-tort claims sufficient to deter like conduct;

F. Award contractual damages in the alternative to the extent any applicable agreement or part thereof is found enforceable and breached;

G. Order restitution, an accounting, and a constructive trust and/or equitable tracing relief over identified funds or assets;

H. Enter declaratory and appropriately tailored preliminary or permanent injunctive relief pursuant to Fed. R. Civ. P. 65;

I. Award pre- and post-judgment interest; and

J. Grant all further relief at law or equity as the Court deems appropriate.

**Plaintiffs demand a trial by jury for all issues so triable.**

Respectfully submitted,

COBB LAW GROUP, LLC

*/s/ Bryant Kroll*

James W. Cobb, BPR No. 033248
Bryant Kroll, BPR No. 033394
131 Walton Ferry Road, Suite 11
Hendersonville, Tennessee 37075
(615) 649-0049
James@CobbLawTN.com
Bryant@CobbLawTN.com
*Counsel for Plaintiffs*